This appellant has not been tried and convicted in accordance with law, and ought not to be required to serve the sentence thereby imposed.

**CROWELL–GIFFORD FURNITURE COM-PANY, Appellant,**

v.

**Millard A. CLOUTMAN, Appellee.**

**No. 4988.**

Court of Civil Appeals of Texas.

Beaumont.

Feb. 24, 1955.

Rehearing Denied March 16, 1955.

Barnes & Barnes, Beaumont, for appellant.

D. F. Sanders, Alto V. Watson, Beaumont, for appellee.

PER CURIAM.

This is an appeal by Crowell-Gifford Furniture Company, a Texas corporation, the appellant, from an adverse judgment in favor of Millard A. Cloutman, the appellee, in a slipping and falling case. The judgment was in the district court of Jefferson County, and awarded damages in the sum of $14,250.

By its first point of error, appellant complains of the trial court's action in overruling its motion for continuance. The court overruled appellant's motion for continuance, based on the absence of Dr. Walter W. Glass, Jr. Dr. Glass is a physician who resides in Port Arthur, in Jefferson County, and at the time the case was called for trial, he was temporarily out of the city in New York. No subpoena had been applied for to secure his attendance at court. The motion for continuance did not show that Dr. Glass had been notified of the setting of the case for trial, or that he had agreed voluntarily to appear and testify, or that any effort had been made to take his deposition. Under the Supreme Court's holding in Fritsch v. J. M. English Truck Line, 151 Tex. 168, 246 S.W.2d 856, this motion did not show diligence on the part of appellant to secure the attendance of Dr. Glass, and it was not error for the trial court to overrule it. See, also, Texas Employers' Ins. Ass'n v. Locke, Tex.Civ.App., 224 S.W.2d 755. The written report of Dr. Glass was received in evidence, on agreement of counsel for appellee that if he were present at the trial he would testify to the statements contained in such written report. This point presents no error and it is overruled.

By his first amended original petition, the pleadings upon which appellee went to trial, he alleged, in substance, that he was the husband of Rosemary Cloutman and as such brings the action as manager of the community estate between them for personal injuries to his wife suffered while he and she were in the furniture store of the appellant at Port Arthur, Texas, for the purpose of buying some household furniture; that the appellant's furniture store has several different floors of furniture and merchandise and that the second floor is accessible by a stairway leading from the first to the second floor; that the stairway is about three or four feet wide and is composed of about 15 steps, and such steps are covered with linoleum or similar type floor cloth; that the front half portion of the surface of each step is covered with a corrugated or treated rubber mat or covering and that the front portion of the step that is covered with a rubber mat is higher than the remaining portion of the step covered with linoleum thereby rendering the surface of each step uneven; on the morning of September 13, 1952, appellee and his wife, while in said furniture store, went upon the second floor and there found the type of furniture they desired and decided to purchase the same and then proceeded to go down to the first floor to consummate the sale; they went down the stairway and when Mrs. Cloutman reached approximately the middle of the stairway the heel of her shoe got caught and hung on the step at the point where the elevation of the surface of said step deviates and changes and more particularly at the point on the surface of said step where the two separate portions of the surface of the step connect at the rear or back edge of the rubber mat on the front half of each step; he further alleged that there was no handrail on the right side of the stairway and that as a "proximate cause" of the difference in the elevation of the surface of the step the heel of her shoe got caught on the back edge of the side of the mat that was upon the front part of the step or the space that was between different levels of the surface of the step and thereby caused his wife to violently trip and fall down the stairway and to sustain serious, painful and permanent personal injuries.

He further alleged that the appellant owed appellee and his wife the duty to

maintain the premises in a reasonably safe condition, but that it failed and neglected to keep the premises in a reasonably safe condition and was guilty of the following acts and omissions constituting negligence, each and all of which were a proximate cause of her injuries and damage: (1) maintaining a mat or covering on the front portion of the steps that was not level with the remaining portion of the step; (2) maintaining a mat upon the front portion of the step that was of a greater height than the balance of the step; (3) maintaining the surface of the step at two different levels or elevations; (4) failing to have the mat on the front portion of the step even and flush with the remaining portion of the step; (5) failing to have metal or other strips fastened along the steps where the mat on the front portion of the step ends and the remaining portion of the step begins; (6) considering the direction of people descending such stairway the appellant was negligent in failing to provide a handrail on the righthand side of the stairway for the use of people descending such stairway.

He further alleged that as a direct and "proximate cause" (he undoubtedly means result) of the negligence of the appellant, his wife tripped and fell violently down the stairway receiving the following injuries: a transverse fracture to the lower portion of the sacrum, with involvement of the surrounding muscles, ligaments, tendons, nerves, blood vessels and soft parts, and with resulting pain, deformity and disability; precipitation and aggravation of a congenital spondylolisthesis, which prior to the accident was not disabling and symptom free, and which condition now has flared up and become painful and disabling as a result of the trauma to said area; the muscles, tissues, blood vessels, cells, tendons, ligaments, nerves, bones and vertebrae in her lumbar and sacro-coccygeal region were strained, torn and broken, and she received a displacement forward of the fifth lumbar vertebra; she has coccygodynia, which is extremely painful and disabling and received contusions of the sacro-coccygeal region; her shoulder was stretched, strained and torn; as a result of such injuries she has suffered excruciating and agonizing physical pain and mental anguish, humiliation and discomfort and in all reasonable probability she will continue to suffer such physical pain and mental anguish for the balance of her life. Said injuries have disabled his wife and he has been deprived of the services, earnings, society, companionship and assistance of his wife and her capacity and ability to render and perform service, earn money, perform various other domestic activities have been permanently impaired and diminished as a result of said injuries. His wife is a woman 31 years of age with a life expectancy of 41 years; because of the past and prospective physical and mental pain and anguish that she has suffered and is going to suffer in the future, and because of the loss of services and earnings of his wife because of her injuries and because of services, earnings and aid that he will lose in the future, together with the fact that his wife's ability to perform said services and earn money will be permanently impaired and diminished, he was damaged in the sum of $25,000.

He further alleged that for his wife's disability he has incurred medical bills for professional services, X-ray examination, drugs and medicines of $125, which was reasonable and the customary charge, and further alleged that he will incur further expenses in the treatment of his wife's injuries to the extent of $625.

The appellant answered by various special exceptions, general denial and by special denials. It specially denied that the condition of the steps alleged in appellee's petition alleged any defects but merely alleged normal conditions which were open and obvious and plainly visible to appellee and his wife, or by the exercise of ordinary care could have been known by them; that there was no condition of facts to hide the steps and their covering, that the actual condition was easily discovered, plain and evident to appellee and his wife; that the steps and stairway were well lighted by outside windows and carefully placed lights and that appellee's wife saw or

should have seen every step and tread if she had used or exercised reasonable care as she walked down the steps. It further alleged that appellee and his wife were guilty of acts and omissions which were the proximate causes of the fall and injuries, in that they each and both failed to keep a proper lookout, and in that the stairway was open and obvious and lighted and the condition thereof easily discernible and could have been seen by each of them and that they therefore assumed the risk, if any, in walking down the stairway, and in that said parties walked down the stairway talking to others, watching children ahead, looking away from the steps and that appellee's wife wore a very long and high heel, causing her ankle to turn and her foot to catch on the front edge of the tread, and in that appellee's wife was walking down the steps in a hurry and at a too rapid rate.

It further alleged that the stairway was well constructed, that the back and front portions of each step were even and level, that on the right coming down such stairway was the wall of the store and on the left was a guardrail which was held by appellee's wife by her left hand; that the stairway was well lighted by natural and artificial lighting, that at about two-thirds of the way up the stairway was a large brilliant light hanging from the first ceiling; that there were several large lights at the foot of the stairway and beyond the top of the stairway were a number of large lights on the ceiling of the second floor, lighting the top landing; that there was a large window at or near the top of the stairway, opening on the outside; that the conditions of all the treads of the stairs were open and obvious to appellee and his wife and the public generally; that appellee and his wife had on numerous prior occasions walked up and down these steps and they knew or by the exercise of ordinary care should have known the condition of the stairs; that because of said facts there were no hidden pitfalls or traps or conditions; that the appellant was guilty of no acts or omissions constituting negligence and further pleaded that the fall was the result of an unavoidable accident.

The case was tried to a jury and at the conclusion of the appellee's evidence the appellant filed a motion for instructed verdict and at the conclusion of all the evidence it presented another motion for instructed verdict. Both motions were overruled.

The court in its charge submitted 23 special issues. The jury by its verdict made the following findings in answer to such special issues: (1) appellee's wife, Rosemary Cloutman, tripped and fell on a step in appellant's store on or about September 13, 1952; (2) when she so tripped and fell she sustained an injury to her body; (3) the surface of the step where she tripped and fell was uneven; (4) the surface of the step had been uneven for a sufficient length of time for the appellant, its officers, agents, servants and employees, in the exercise of ordinary care, to have known of it; (5) the appellant in maintaining the surface of the step in an uneven condition "was negligence"; (6) such negligence was a proximate cause of the injuries to Rosemary Cloutman; (7) the failure of the appellant to have metal strips fastened along the surface of the steps was negligence and (8) was a proximate cause of the injuries to Rosemary Cloutman; (9) the tripping of Rosemary Cloutman on the surface of the step in the appellant's store was not the result of an unavoidable accident; (10) $13,500 would fairly and reasonably compensate the appellee for the injuries to his wife proximately caused by the negligence of the appellant; (11) appellee has incurred in the past or will incur in the future for reasonable and necessary medical expenses as a proximate result of the injuries to his wife; (12) $750 would compensate appellee for such medical expenses; (13) there was an unusual risk in the use of the stairway by customers of the appellant; (14) such unusual risk was not open and obvious to appellee by the use of ordinary care; (15) appellee's wife did not fail to keep a proper lookout; (18) appellee's wife was not walking down the stairway wearing a very high heel shoe; (21) the appellant did not exercise ordinary care in the building and construc-

tion of the treads on the stairway; (22) on the treads on the stairway there was a defect or danger not known to appellee's wife actually known to the appellant or its agent; (23) appellee's wife did not knowingly and voluntarily expose herself to such risk as existed.

Judgment was entered on the jury's verdict. The appellant filed its amended motion for a new trial, which was overruled by the court, and the appellant has duly perfected its appeal to this court.

The appellant by its 2nd, 3rd, 4th, 5th, 6th and 8th points contends that this case should be reversed and rendered because (2) the trial court refused its motion for instructed verdict since neither appellee nor his wife asserted in any of their pleadings or evidence that there was a hidden or latent defect or pitfall or trap; (3) it is shown conclusively that appellee's wife and appellee knowingly assumed whatever risks obtained at the time and place in question; (4) the trial court failed to sustain appellant's contention that appellee's wife was guilty of contributory negligence as a matter of law; (5) the trial court erred in failing to sustain its contention in its motion for instructed verdict when appellee's only basis for recovery was an alleged uneven tread on the stairway, which he alleged should have been covered by a metal strip and which appellee admitted was even and flush; (6) the trial court erred in refusing its motion for instructed verdict because as a matter of law the stairs were covered with standard coverings on the treads; (8) the trial court failed to sustain its contention in its motion for instructed verdict that plaintiff should recover nothing since both appellee's wife and appellee himself admitted that the stairway was adequately and properly lighted. By its 7th point it says, "This case should be reversed because the overwhelming preponderance of the evidence shows conclusively that there were no hidden defects or pitfalls on the stairway in question at the time and place in question."

All of these seven points are directed at the sufficiency of the evidence to warrant submission of the case to the jury and to support the judgment for the appellee against the appellant. The parties to this appeal have presented in their briefs conspicuously divergent views of what was shown by the evidence, and we therefore find it necessary to give a résumé of the evidence relating to the matters presented under these seven points. Mrs. Rosemary Cloutman, wife of the appellee, testified that on September 13, 1952 she and her husband and two children went to the furniture store of the appellant in Port Arthur to buy some bedroom furniture; she had traded at the store before and had bought a living room table in 1950 on the downstairs floor of the store; the salesman took them upstairs where she selected the furniture she wanted and started back downstairs to consummate the sale; the children went down first, she was several steps behind and her husband and the salesman were behind her several steps; coming down the steps, part of the steps are obscured by the preceding step, you see only about half of each step, or the first third of each step as you go down; there was a handrail on the lefthand side going down and on the righthand side there was none. She went down the lefthand side with her hand on the rail; there were about 15 steps to the stairway, when she was about half way down she fell. She was walking down the steps and had the handrail, and her left foot hung on something on the step, and when it did it jerked her hand loose from the handrail and she fell; she tried to regain her balance but never could. She hit the bottom before she stopped when she fell; she fell in a sitting position either on the last step or on the floor. She bumped and fell to the end of the stairway; she had on a high heel black patent leather sandal, which shoes were brought to the trial and exhibited to the jury. The pull on the ankle pulled the buckle loose on the shoe when her foot caught; the heel on the shoe was an ordinary high heel for a ladies' shoe, about a 2-inch heel; it is not an unusually high heel for a ladies' shoe. She had worn the shoes since that occasion and wore them to church once. After her

husband picked her up Mr. Cockerham, the salesman, came up behind them and then Mr. Pond, an official of the company, arrived and asked what had happened. Mr. Cockerham told him there had been an accident. Mr. Pond's reply was, "How do I know she hurt herself here in the store?" Then they drew up the papers for the completion of the sale of the furniture and she went home. She then testified about pain she felt and the doctors she went to and the treatment prescribed and taken, and her physical condition to the time of trial.

On cross-examination she testified that when one is standing on one tread of the stairway he can see about half or three-quarters of the tread next below him. When she was asked, did you slip down the steps, she answered "No, sir, my foot caught and I fell." "Q. After you fell did you slip down the steps? A. I bumped and fell down the stairs." She went up the same stairway about 20 or 30 minutes before she fell. "Q. And you looked at the stairway, naturally, as you walked up it? A. No, sir, I never noticed; I just walked up the stairs and I was talking to Mr. Cockerham and telling him what I wanted."

Mr. Gifford, president of the appellant company, described the building in which its store is operated and the stairway on which the fall took place. He testified that the stairway has approximately 17 or 18 steps; the steps are 11 inches wide from the front of the step back to the riser; the steps overhang each other so that it extends possibly ¼th of an inch; the stairway was recovered in 1947 with a black tread on the front of the steps and thick linoleum on the other portion of the step, which linoleum is exactly the same height as the front part of the tread; he had gone back over the steps again and they are always maintained perfectly level. There is a crack where the two materials join but it is perfectly smooth; the treads have not been replaced since they were built up to the time of the accident and they have not been changed or altered in any way after the fall. The black tread on the floor of the steps and the linoleum on the other parts are identically the same in thickness. He made an examination of the steps on the day of the fall and there was no difference at that time.

Millard Cloutman, the appellee, testified that he was with Mrs. Cloutman at Crowell-Gifford's store when she fell; as they came down the stairs from the second floor to the first, the children were ahead of them and were about half way down when his wife started down. Mr. Cockerham and he were talking about the mattress and box springs they had picked out to buy and as he turned to start down the stairs or just as he started down the stairs, that is when her left foot got hung and it tripped her and instead of going over forward she was throwing her arms and her legs out, just like there is a tendency to do when you are trying to keep from going on your head, and she landed in more or less a seated position, not straight up and down, but she landed on her seat, and she bounced the rest of the way to the floor. She appeared to hit each one of the steps as she fell, she was approximately half way down the steps when her left foot caught, he ran down the steps and picked her up and asked her if she was hurt. Mr. Cockerham also asked her if she was hurt and she said that she didn't know, that her seat was numb. He also related a conversation with Mr. Pond as related by Mrs. Cloutman. He then testified in regard to his wife's activities, as to treatment and the physical effects of her fall. The next time when it came time for a payment to be made on his note he went to the store and walked over to the stairs and raked his foot across the step or tread of three or four steps and could feel an uneven surface, a difference between the two materials. There was an uneven surface there at the junction of the two materials. The black material at the front was approximately ¹⁄₁₆th to ⅛th inch higher than the linoleum. He examined about half of the steps. This difference in elevation was not an obvious difference and he would not notice it unless he was checking for it or checking the stairs to see if it was even.

On the date he was in there, on the date he bought the furniture, he did not notice the difference between the two elevations. He could not see it with his naked eye, but he could feel it. On cross-examination he testified as follows:

"Q. The stairway was well lighted? A. Well, what is your definition of well lighted?

"Q. Well, there was a big window on the left of the stairway on the outside? A. Close to the top or half way down or what?

"Q. Near the top? A. Yes, sir.

"Q. And there was a big window? A. Average size."

The window was on the outside wall of the building. We quote the following portion of his testimony on cross-examination:

"Q. There were several big lights right down around the foot of the steps; is that right? A. Well, there was some light down there, yes, sir.

"Q. It was adequately lighted? A. I would say it was averagely lit: not over lighted or under lighted; average lit.

"Q. You could see every step of the stairway as you walked up a few minutes before this happened? A. Repeat that, please.

"Q. You could see every step easily as you walked up a few minutes before your wife fell? A. Yes, sir.

"Q. And you could see every step as you walked down? A. You could see a portion of every step.

"Q. Well, you could see practically all of the next step to the one you are standing on; isn't that right? A. You mean the one behind you or the one in front of you?

"Q. The one in front of you. A. You could see about half of it.

"Q. What covered up the other half? A. Well, your elevation, you are standing on it: your riser, you might say.

"Q. If you were standing there on the next tread the riser would extend about halfway over the next tread below you; is that right? A. No, the riser doesn't extend over your stair.

"Q. What is it that extends over to cover about half of it so you can't see it? A. It is the preceding step.

"Q. Oh, the preceding step extends over about half? A. I didn't say anything extended over; the preceding step obstructs the view as you are going down.

"Q. So you can't see the next step to be stepped on but about half? A. That's right: a portion of it; I don't know whether a half or a quarter, or what: the front portion.

"Q. It may be less then half; is that right? A. It might be.

"Q. The thing that covers it up is the next tread above, isn't it? A. The next tread above obstructs your view, yes, sir.

"Q. And that tread is 5 inches, is that right, above the next tread below? A. You mean on this particular stairs?

"Q. Yes; the step up is about 5 inches, isn't it? A. I didn't measure it; I would say about 5 or 6 inches.

"Q. And you heard Mr. Gifford say a while ago that tread extended over about a quarter inch? A. That's right.

"Q. And then your eyes are about 5 feet and some inches above the tread you are standing on, aren't they? A. Yes, sir.

"Q. And still you think the tread you are standing on will cover at least half or maybe more of the tread below? A. I said it would obstruct your view, going down the stairs.

"Q. On the tread next below you? A. That's right."

He further testified that he did not remember ever going up those steps before. When he had gone up before to the second floor he had used the steps on the other side or the freight elevator. He did not

know of anybody else to ever fall down those steps, he never had occasion to know. There was nothing in the world in the way of light or any other obstruction to keep him and his wife from seeing every tread as they went up, there was nothing in the way of light or otherwise to keep them from seeing every tread as they came down except that when you are going down unless you step on each one and look at the next one and then step down and look at the next one.

Mr. Albert B. Brown testified that in May, 1953, he went to the appellant's store and inspected the stairway from top to bottom. The black rubber tread on the front of the step was about ⅛th inch higher than the linoleum on the rest of the step. This was not noticeable; he had to look close to see.

Mrs. Hildabridle testified that she went in May, 1953 to the appellant's store and inspected the stairway and the covering on the steps. It had a linoleum type finish that went over the complete steps and over that was a rubber trim that extended half way or two-thirds the way of the step. It was corrugated and had grooves in it, there was a difference in the elevation of the black part and the linoleum covering. She wore a pair of high heels and on several of them she rubbed her heel over the trim and it caught her heel on several of the steps. She estimated the difference in the elevation as ⅟₁₆th of an inch or a little more.

A. E. Wiggins testified that he is a lawyer practicing in Beaumont, and on the day preceding his testimony on the trial he went to appellant's store and examined the steps on the stairway. He measured the steps and examined the surfaces on the steps. The overlap of one step over the riser was 1½ inches; the black portion of the surface of the steps is 6¼ inches wide. He described the light on both the first and second floors near the stairway and said the stairway is not well lighted; he could not see the bottom of the steps the way they were lighted; when he saw them as he was walking down. There was

a difference in the level of the two parts of the material on the step; step No. 9 had a ⅛th inch difference, the black surface is ⅛th inch above the linoleum part on a certain section of it; certain sections of each step on the stairway would raise up to ⅛th of an inch. He took his ruler with him and measured it by pulling the edge of the ruler across the step from back to front, on each step there was some portion on the black surface that would stop the ruler. He got down on his knees on the steps and looked at it. A person walking down the steps could see the black part of the surface covering. In walking down the steps, without a close investigation it could not be determined that there is a rise in the black part of the material.

The appellant quotes in its brief from the deposition of Mrs. Cloutman introduced in evidence by it the following:

"Q. You walked up the steps 10 minutes before that? A. Yes, sir.

"Q. And it was well lighted? A. I didn't notice the lights at all.

"Q. Well, you could see the steps? A. Yes, sir, I could see the steps.

"Q. And you could see each tread on those 15 steps, didn't you? A. Yes, sir.

"Q. The stairway was well lighted by the outside or some sort, is that right? A. Yes, sir, it was light.

"Q. Well lighted from some source, is that right or wrong? A. It was lighted from some source."

Appellant also introduced portions of the deposition of appellee in which he testified that he and his wife had bought furniture at appellant's store before September 13, 1952, and had been upstairs.

"Q. You had been upstairs and you went up the same stairway as when you bought the furniture on September 13, 1952? A. Yes, sir.

"Q. You could see everything plainly and clearly and nothing hidden on any step? A. Yes, sir.

"Q. A little before you get to the top of the steps on the left hand is a big window to the left? A. Yes, sir.

"Q. At the top of the steps some 10 or 15 feet back and to the right there was 5 or 6 big lights, do you remember that? A. Well, there was some lights, I don't remember how many.

"Q. They were big lights, too, weren't they? A. Normal lights.

"Q. In other words, the stairway was well lighted wasn't it? A. Well, like I said it was normally lighted."

The following excerpt from the deposition of Mr. Cloutman was introduced by the appellant and in its brief the appellant says that was an admission by Mr. Cloutman and established as a matter of law that the surface of these steps was even:

"Q. The black rubber matting extended about half way back on the tread? A. Well, half or three quarters.

"Q. And you mean the black had a perpendicular edge to the back of it. A. Not particularly; it seemed like it was set in.

"Q. When you say 'set in', you mean set to the wood? You mean flush with the wood or whatever it was behind it? A. That's right.

"Q. Do you know it is flush, with the black? A. It is supposed to be flush.

"Q. And it is flush with the black? A. Well, I wouldn't say it was, all over. It is supposed to be, like I said. When they laid it in there, they laid it in there probably to be flush."

These points are overruled. The evidence does not establish as a matter of law that the surface of the steps was even and smooth, or that the condition of such steps was open and obvious, or that appellee and his wife were guilty of contributory negligence, or that they knowingly assumed whatever risks the stairway offered to a user, or that either appellee or his wife admitted on the trial that the surface of the stairway was even, or that the evidence shows conclusively that there were no hidden defects or pitfalls on the stairway, or that the appellant's motions for instructed verdict should have been sustained for any reason. From a reading of the entire statement of facts we are satisfied that the contrary of these points advanced by the appellant is true, and that from the evidence the jury was warranted in finding that the surface of the steps was uneven and that this condition could not be easily observed by one walking up or down the stairway and could be noticed only by a person who was looking at it closely and looking for such a condition. This is true even though the lighting of the stairs was sufficient for a person to see the steps and the surface thereof generally. The appellant owed to the appellee and his wife the duty to use ordinary care to maintain the stairway in a reasonably safe condition so that she would not be injured thereby. See Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609, 23 A.L.R.2d 1114. We think the evidence as above outlined was sufficient to support the findings of the jury of negligence and proximate cause as are above set forth; the findings that the unusual risk in the use of the stairway of customers of the appellant was not open and obvious to appellee and his wife, that she was not guilty of acts of contributory negligence and that she did not voluntarily assume the dangers of using said stairway with a full knowledge and acceptance of the risk as it existed. See: Renfro Drug Co. v. Lewis, supra; J. Weingarten, Inc., v. Brockman, 134 Tex. 451, 135 S.W.2d 698; McCrory's Stores Corporation v. Murphy, Tex.Civ. App., 164 S.W.2d 735; Walgreen-Texas Co. v. Shivers, 137 Tex. 493, 154 S.W.2d 625; Blanks v. Southland Hotel, 149 Tex. 139, 229 S.W.2d 357; Hall v. Medical Building of Houston, 151 Tex. 425, 251 S.W.2d 497.

Appellant's 9th point is as follows: "This case should be reversed because of the trial court's error in refusing to give this requested issue: Do you find from a preponderance of the evidence that

the stairway in question at the time and place in question was well lighted by a combination of natural and artificial light?" We do not believe the question of whether the stairway was well lighted would have presented one of the controlling issues made by the pleadings and the evidence in the case. The stairway may have been well lighted and the jury might have so found in answer to such requested special issue if it had been given in the charge, and yet such a finding would not have relieved the appellant from liability in view of other findings of negligence and proximate cause which were made by the jury. The uneven condition of the two sections of the covering of the surface of the steps was of such a nature that, according to the testimony, a person would have to get down close to it to notice it. The trial court is given some discretion in framing and submitting the issues in a charge and is not required to submit issues that are merely evidentiary or unnecessary. Dallas Ry. & Terminal Co. v. Straughan, Tex.Civ.App., 254 S.W.2d 882. No error is shown under this point and it is overruled.

By its 10th point the appellant complains of the instruction given in the charge in connection with Special Issue No. 9, the unavoidable accident issue, which was as follows:

"If you find from a preponderance of the evidence that the tripping in question was not the result of an unavoidable accident, then the form of your answer will be 'It was not the result of an unavoidable accident.' Otherwise, your answer will be, 'It was the result of an unavoidable accident'."

By its 11th point it complains of the instruction given in connection with Special Issue No. 14, which inquired whether the unusual risk, if any, in the use of the stairway was not open and obvious. This instruction was as follows:

"If your answer to the foregoing issue from a preponderance of the evidence is in the affirmative, then your answer will be: 'It was not open and obvious'. Otherwise, your answer will be, 'It was open and obvious'."

These two points are presented together in its brief and we will discuss them together here. Appellant says that these instructions are erroneous and are calculated to place an improper burden upon it. We believe that the experience of both the trial and appellate courts is that the instruction as given is more easily understood by a jury than any others which have been tried with a singular lack of success in the past. The two alternative answers given to the jury in these instructions makes certain that the answers which they make to such issues truly express the finding actually made by the jury. In the earlier days when the charges of trial courts required an answer of either "yes" or "no" to the issue, juries frequently answered "no" when they meant to say that they found no unavoidable accident. We think that the language used by the trial court in the instant case complies with that portion of Rule 277, Texas Rules of Civil Procedure, that, "Where practicable, all issues should be submitted in the affirmative and in plain and simple language." The instructions are in plain language, easy to understand. We think the instructions under attack are not subject to the objection of the appellant, that they are not misleading or erroneous, and they did not place an improper burden of proof upon it. The case cited and relied upon by the appellant under this point, Gulf, C. & S. F. Ry. Co. v. Giun, 131 Tex. 548, 116 S.W.2d 693, 695, 116 A.L.R. 795, is not in point. It involves a case in which the unavoidable accident issue was submitted, with a direction for an answer, "yes" or "no." The Commission of Appeals held, in an opinion adopted by the Supreme Court, that this was not error, but suggested that it was not necessary to submit the issue with such an instruction but that the jury be directed to answer in the affirmative, " 'It was not an unavoidable accident' ", and that otherwise the answer should be "no". We do not believe that the holding in this case requires such an

instruction and no other. These points are overruled.

■ The appellant's 12th point of error, by which it complains of the trial court's refusal to give the definition of unavoidable accident as requested by it, is not briefed by the appellant and is therefore waived.

■ By its 13th, 14th, 15th, 16th, 17th and 18th points the appellant complains of the action of the trial court in refusing to submit various requested special issues. By such requested issues inquiry would have been made whether (13) the stairway tread in question was covered by a standard approved safety tread; (14) whether on the treads of the stairway in question there were any traps, snares, pitfalls or the like which could not have been known to appellee's wife by the use of ordinary care; (15) whether on the treads in question on the stairway there was any hidden defect or danger not known to appellee's wife and actually known to appellant or its agent; (16) whether any duty owed by the appellant to appellee's wife at the time and place in question with reference to the construction of the treads on the stairway in question was violated; (17) whether neither appellant nor its agent had any superior knowledge of any defect, if any were found, in the tread in question on the stairway; (18) whether there was a condition in the tread on the stairway at the time and place in question which involved an unreasonable risk to appellee's wife's safety. The wording of the requested special issue set out under the appellant's point Number 16 appears in the appellant's amended motion for new trial and is called "Requested Issue No. L" therein. However, such a requested special issue does not appear in any of the bills of exception preserved by the appellant. The transcript contains bills of exceptions showing requests for Special Issues Nos. A, B, C, D, E, F, G, H, H–1, I, J, K, M, and so on through the alphabet to No. S, but no Requested Issue No. L appears in the record. Under none of such numbers of special requested issues does there appear in the transcript any request for the issue set out under Point Number 16. Under Rule 279, Texas Rules of Civil Procedure, the appellant was required to present to the trial court a request in writing for the submission of such an issue, since it was one relied on by the appellant. If there was any error in failing to submit such an issue, the error is waived by failure to comply with Rule 279, supra.

■ All the other said issues, as well as the one mentioned immediately above, requested the submission of matters which were in our opinion submitted in other portions of the court's charge, or they presented either evidentiary or immaterial issues and did not present any controlling or ultimate issue not submitted in some of the special issues contained in the court's charge. All of these points are overruled.

■ The appellant's 19th point is that the trial court refused to define the phrase "natural and continuous sequence" as used in its charge. Its objection to that portion of the charge stated that the phrase "natural and continuous sequence" is a highly technical phrase and should be defined for the guidance and convenience of the jury. No substantially correct definition of the phrase was submitted by the appellant to the trial court. Under Rule 279, T.R.C.P., such a failure to submit a definition shall not be deemed ground for reversal, unless a substantially correct definition has been requested in writing by the parties complaining of the judgment. However, as the Commission of Appeals has held in Massingill v. Henwood, 138 Tex. 317, 159 S.W.2d 118, 120, in an opinion adopted by the Supreme Court, that there was no error in failing to define the term " 'natural and continuous sequence' ", on the authority of that case we overrule this point.

■ The appellant contends in its 20th point that the trial court's definition of the phrase "new and independent cause" was improper. The court's definition was as follows:

"By the term 'new and independent cause' as used in the above definition of 'proximate cause' is meant an agency which breaks the sequence between the original act and the event complained of, which of itself is sufficient to and does produce the event or some like event, and be such agency that without which the event in question would not have occurred. This agency must not be set in motion by the party who initiated the original act, and which agency and its consequences a person of ordinary prudence under the same or similar circumstances would not have reasonably anticipated and foreseen."

The definition as given has been approved as a correct definition of the term " 'new and independent cause' " in Airline Motor Coaches v. Owens, Tex.Civ.App., 199 S.W. 2d 802, 806; Airline Motor Coaches v. McCormick, Tex.Civ.App., 186 S.W.2d 689. Both such cases were by this court and we adhere to our opinion expressed therein that such a definition is not improper and this point is overruled.

■ By its 21st point the appellant contends that the trial court erred in submitting in its charge Special Issue No. 3, which issue inquired whether the surface of the step at the place where appellee's wife tripped and fell was uneven. It objected to including such issue in the charge for the following reasons: (1) because the overwhelming preponderance of the evidence is contrary to an affirmative answer; (2) because the evidence is so overwhelmingly contrary to an affirmative answer to that issue that such a finding to be manifestly wrong and unjust; (3) because the evidence is insufficient to support an affirmative finding to said issue. From what we have said above in the discussion of appellant's points relating to the sufficiency of the evidence it is apparent that we believe that the evidence is sufficient to warrant and require the submission of this special issue. The testimony of the witness Wiggins alone was sufficient to raise this issue. The appellant in its brief says that Wiggins' testimony is of no consequence since it refers to "more

than a year later." The testimony of two of the officers of the appellant corporation was that the condition of the steps was the same at the time of trial that it was at the time of Mrs. Cloutman's fall. Mr. Wiggins had made his examination of the steps the day before he testified. His testimony related in detail the difference in height between the front and rear portions of the steps and particularly step No. 9 of the 15 steps comprising the stairway. The testimony of the witnesses Mrs. Hildabridle and Mr. Albert B. Brown also was in support of an affirmative answer to this issue. This point presents no error and it is overruled.

■ Appellant's 22nd point reads as follows: "This case should be reversed because the trial court in instructing the jury as to the measure of damage erroneously and prejudicially defined that measure." In its brief under this point the appellant quotes only the following portion of the definition given in the court's charge in connection with Special Issue No. 10: "In arriving at the amount of money, you may take into consideration * * * the present cash value of Rosemary Cloutman's diminished capacity, to work and earn money in the future, and to perform her household duties."

In connection with Special Issue No. 10, the trial court in its charge gave the following instruction:

"In arriving at the amount of money, if any, as above inquired about, you may take into consideration and consider only such, if any, the following items in paragraphs (a), (b) and (c), inclusive, as have been established by a preponderance of the evidence to have been proximately caused plaintiff (if you so find) by the negligence, if any, of the defendant on the occasion in question to-wit:

"(a) Such loss of capacity to work and earn money and perform household duties, if any, of Rosemary Cloutman since the date of said injuries, if any, to the date of this trial proximately caused (if you have so found) by the negligence, if any,

of the defendant as shown by a preponderance of the evidence; and the present cash value, if any, of Rosemary Cloutman's diminished capacity, if any, to work and earn money in the future, and to perform her household duties, which she will reasonably and probably experience (if you so find) proximately caused (if you so find) by the negligence, if any, of the defendant on the occasion in question, as shown by a preponderance of the evidence.

"(b) Such physical pain and suffering, if any, as you have found Rosemary Cloutman has suffered in the past from the date of said injuries, if any, proximately caused Rosemary Cloutman (if you have so found) by the negligence, if any, of the defendant on the occasion in question, as shown by a preponderance of the evidence; and the present cash value, if any, of such physical pain and suffering, if any, as Rosemary Cloutman will reasonably and probably suffer in the future, proximately caused, (if you so find) by the negligence, if any, of the defendant on the occasion in question, as shown by a preponderance of the evidence.

"(c) Such mental anguish, if any, as you have found Rosemary Cloutman has suffered in the past from the date of said injuries, if any, proximately caused Rosemary Cloutman (if you have so found) by the negligence, if any, of the defendant on the occasion in question; and the present cash value, if any, of such mental anguish, if any, as Rosemary Cloutman will reasonably and probably suffer in the future, proximately caused (if you so find) by the negligence, if any, of the defendant on the occasion in question.

"You are further instructed in this connection that in answering this issue, you will exclude from your consideration any loss, if any, of earnings and any impairment as to earning capacity, and performing household duties, if any, and any diminished capacity for work, if any, as well as any physical pain and suffering and mental anguish, if any, sustained or suffered by Rosemary Cloutman in the past, since the date of said injuries, if any, in question, or that she may suffer in the future, as a result of any other injury, infirmity, or pre-existing conditions; but you may take into consideration loss of capacity to work and earn money, if any, and disability, if any, to perform household duties, if any, and physical pain and suffering, if any, and mental anguish, if any, in the past, since said injury, if any, and loss of capacity to work and earn money, if any, and disability to perform household duties, if any, and physical pain and suffering, if any, and mental anguish, if any, which Rosemary Cloutman will reasonably and probably experience in the future, if any, resulting from aggravation, if any, of any pre-existing condition, if any, proximately caused Rosemary Cloutman (if you have so found) by the negligence if any, of the defendant on the occasion in question as shown by a preponderance of the evidence. But in considering aggravation of any pre-existing condition, if any, you may consider it only to the extent that you may find from a preponderance of the evidence that the pre-existing injury or disease, if any, has been aggravated."

The appellant assails the use of the phrase "the present cash value, if any, of Rosemary Cloutman's diminished capacity, if any, to work and earn money in the future and to perform her household duties * * *," and says that the measure of damage is never the present value of any claimant's diminished capacity. It further says that this error is self-evident and does not require the citation of authorities. We believe that when the entire instruction, which is set out above, is considered, the use of the awkward phrase "present cash value of Mrs. Cloutman's diminished capacity to work and earn money" is not error. The instruction limits the consideration of the jury to the various proper elements of damage detailed therein. This point presents no error requiring a reversal and it is overruled.

By its last and 23rd point, appellant contends that the trial court erred in permitting Dr. Swickard, a medical witness

called to testify by appellee, to testify over its objection about "large speculative amounts of future medical bills," which testimony, it says, was based on purely admitted speculation. The point arises from the following questions, answers, objections and rulings while Dr. Swickard was testifying on examination by counsel for appellee:

"Q. I believe I have asked you if there is any remedy for this lady's situation, and you have said she is going to have to live with it? A. Well, I thought from the treatment prescribed for her, that she was doing about all anybody could do. She takes hot sitz baths, and takes aspirin and salicylates of some kind when it hurts, and she protects herself when she can; and I think that is about all the treatment that anyone could offer.

"Q. Could you estimate for us such reasonable and necessary medical care as the lady will need, in dollars and cents in the future, doctor, her life expectancy, assuming it is some forty years, that is attributable to this falling situation? A. I think that is strictly speculative, because if she gets even a minor injury her disability is going to be long, and about the only estimate you could give it would be that it has been in the past, which in my opinion I don't believe it is going to get any better—may get worse. If she has a long period of disability, especially hospitalization, it is real expensive.

"Q. Could you give us some dollars-and-cents bottom and top figure of what could be anticipated on medical expense?

"Mr. Barnes: We object to that; the witness has already testified it is purely speculative.

"The Court: Can you answer that question without any speculation?

"The Witness: I think it would be strictly speculative.

"Q. Well, could you say it is similar to this? Estimate that $625.00—let's take $625.00. Is it reasonable to expect that she will require necessary medical treatment, that the expenses for the treatment of this condition and its progression over the next 40 years, would you say that would be a reasonable amount you could expect it would require, without speculation?

"Mr. Barnes: We object to that for the same reason.

"The Court: If he can answer it without speculation, based upon his qualifications as a medical expert, if he has an opinion that he can state as an opinion and not as speculation, he can answer.

"Mr. Barnes: We would object to it further because this witness has already said such a statement would be purely speculative.

"The Court: He did in answer to one question. I don't know whether that would apply to the other questions or not. If you have any opinion, doctor, not based upon speculation, you may answer.

"Q. You understand I am trying to arrive at some figure which you can more or less certainly say the lady would be reasonably expected to incur over the next 40 years. A. I think it would be very difficult, because it would depend entirely on whether she gets a pain in her back when she stoops over to pick up a piece of paper; she might do it 20 times and never hurt, and next time it could; and I think the disability would be long even from very trivial injuries, and next time she might do it and not bother her any.

"Q. Would it be reasonable to expect future medical expense from the expected difficulty she would reasonably have? A. It is according—would depend entirely on what she does and how she does it. I think in money it would be very hard to estimate.

"Q. You understand—I may not be putting it clearly—I would like for the jury to know if you can estimate—we folks can't estimate it. But is there some sum that is so low that you can say they would have to spend at least that much for treatment of the condition in her back?

"Mr. Barnes: Since the witness has made the statement, we have the same objection to that.

"Q. I am trying to remove the speculation from it. Is there some sum real low, that she would definitely and probably have to have? Can you give such an estimate, doctor?

"The Court: If the doctor can give any opinion, not based upon what would be speculative and anticipatory, anything that he might anticipate would happen—don't state any speculation, but only what your medical training and experience teach you.

"Mr. Barnes: We will add to that objection: because it is not a question of what might occur in reasonable probability in the future.

"Q. Do you understand my question, doctor? A. Yes, sir, I think that—

"Mr. Barnes: Has the court ruled on it?

"The Court: No other ruling except what would be covered by the instructions the court gave him: not speculative or anticipatory of future events, but that which his medical training and experience would give him as an opinion. Of course, it is based on his medical training and experience.

"Mr. Barnes: May we ask whether he is going to answer the question asked by the Court?

"The Court: I wasn't asking a question. I was telling the doctor some things to keep out.

"Mr. Barnes: How can we apply the ruling of the Court to this exception before he answers the question?

"The Court: He can answer it, if he can.

"Mr. Barnes: Note our exception.

"A. I would still not want to give dollars and cents in the future. I believe a safe assumption would be—

"Mr. Barnes: Your Honor, it is apparent that he doesn't want to give it.

"Mr. Watson: If Your Honor please, let's let him finish his answer. If it is im-proper the Court can instruct the jury not to consider it.

"Q. What did you start to say? A. I think it would be safe to assume that this patient will have probably the same amount of medical expense down the next years as she has in the past year, because her condition as it stands now is permanent, and aside from the fracture, which occurred over a year ago, I would think that that would run about right.

"Q. Doctor, while you are here, you may be the last medical witness—If you assume that she went to Dr. Goodwin, Dr. Goodwin took x-rays of the spine and prescribed some medicine for her, two different types of medicine, which she took, and that Dr. Goodwin saw her on two other occasions—that is, he saw her and took x-rays one time, and saw her another occasion and then sent her to Dr. Glass; she saw Dr. Glass four times, I believe; and there were at least two sets of x-rays taken, and she consulted him about the matter within the past period of time from September 13, 1952 to October 8, 1953, what would be a low, reasonable estimate of the reasonable and necessary expense that she has been to in connection with this injury medically? Do you understand me? Or does that pose too many problems? I am trying to ask you to set the charges that Dr. Glass made, or Dr. Goodwin made, or that you made, but want to get the average reasonable expense for that attention, for medical, x-rays, and that type of thing.

"Mr. Barnes: We object to that question and any answer the witness may give for the reason that it has not been shown that the doctor knows, and the doctor has not been furnished information as to the number of calls and the number of pictures and the number of treatments that have been given by these various doctors; it has not been made clear the time the doctors spent.

"The Court: I think the Court will sustain the objection, counsel.

"Q. I will rephrase the question, to make it adhere strictly to the record before the Court. Assume that this lady was required

to consult Dr. Goodwin on the day on which this fall occurred, which was Saturday, and on the next Monday and Tuesday she was required to consult Dr. Goodwin again; that the second time he took x-rays, and she had to come back to Dr. Goodwin a third time for examination and for whatever treatment or advice that he would give her, and that he referred her to Dr. Kuhlman, a Roentgenologist, who took the x-ray pictures that you have seen here today; and without any charge for your consultation at all, but just those doctors I named—Dr. Goodwin, Dr. Glass, and Dr. Kuhlman, and without trying to fix the fee of these doctors individually, because I understand they are individually set, · just like lawyers' fees, aren't they? A. That's right.

"Q. But just looking at the cross section of the medical profession, and basing it solely on fees which would be entirely reasonable and proper and necessary as a result of the injury which you find this lady as having, what would you say for the year—that is up to the date of this trial—would be the reasonable charge that would be made for those services as detailed to you, not including any other? A. The three physicians?

·"Q. Yes, sir. A. The services they rendered? .·

"Q. Yes, sir. A. Oh, I would think $125.00.

·"Q. And it is your opinion that she would reasonably be expected to expend substantially that sum every year from now on? A. I would think so, yes."

The cross-examination of the witness by counsel for appellee shows no reference to or questions about the testimony complained of.

This point presents no error. It is apparent that the careful trial judge sustained appellant's objections to the objectionable features of the testimony offered, and the witness testified thereafter without objection that appellee would reasonably be expected to have a medical expense of $125 a year for her injuries for the rest of Mrs.

Cloutman's life. She had a life expectancy of over 37 years. The jury by its verdict found the sum of $750 to be the medical expense in the future, and this was the amount awarded in the judgment for such damages.

No error appearing, the judgment is affirmed.